UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PTC THERAPEUTICS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>ACUREX BIOSCIENCES CORPORATION, et al.,<br><br>    Defendants. | Case No. 25-cv-04594-AMO<br><br>**ORDER RE PLAINTIFF'S MOTION TO DISQUALIFY**<br><br>Re: Dkt. No. 45 |

Plaintiff PTC Therapeutics, Inc. ("PTC") asserts Defendants AcureX Biosciences Corporation ("AcureX"), Dr. William Shrader, and Dr. Sean Pintchovski misappropriated trade secrets regarding treatment of neurodegenerative diseases. On August 5, 2025, Defendants moved to unseal the Complaint. (Dkt. No. 33.[1]) In support of their motion, Defendants submitted the affidavit of Dr. Gladys Monroy, whom PTC contends had a prior attorney-client relationship with BioElectron Technology Corporation ("BioElectron"), PTC's predecessor-in-interest. (Dkt. No. 34-1.) PTC moves to strike the Monroy Affidavit, as well as disqualify both Dr. Monroy and Cotchett, Pitre & McCarthy, LLP ("CPM"), counsel for Defendants. (Dkt. No. 45.) Defendants oppose the motion. (Dkt. No. 57.)

Having considered the parties' submissions, and with the benefit of oral argument heard on November 20, 2025, the Court **DENIES** the motion to disqualify Dr. Monroy and CPM. The Court also **DENIES** the motion to strike Dr. Monroy's affidavit.

//

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

# BACKGROUND

Drs. Shrader and Pintchovski initially worked for BioElectron (formerly known as "Edison Pharmaceuticals, Inc."), where they "played important roles in the research, development, and characterization of the company's lead compound, EPI-743, otherwise known as 'Vatiquinone.'" (Dkt. No. 2 ¶ 3.) "Vatiquinone can be used to inhibit 15-lipoxygenase ("15-LO"), an enzyme involved in oxidative stress," which in turn can "protect[] nerve cells and support[] their function against neurodegenerative diseases like Friedreich's ataxia and Parkinson's disease." (*Id*.) Building on this research, Drs. Shrader and Pintchovski continued to work for BioElectron on the development of a "second generation Vatiquinone," ultimately known as EPI-857 (Utreloxastat). (*Id*. ¶ 7.)

"In April 2019, PTC acquired substantially all BioElectron assets, including Vatiquinone and EPI-857 (Utreloxastat)." (*Id*. ¶ 9.) PTC attaches a copy of the Asset Purchase Agreement that facilitated this transaction, which describes the assets transferred. (*Id*. at 51, 109-11, 136.) , BioElectron "agreed to sell, transfer, convey, assign and deliver to [PTC] substantially all of the assets of [BioElectron], and [PTC] has agreed to assume certain of the liabilities of [BioElectron]." (*Id*. at 136.) Schedule 3 to the Asset Purchase Agreement provides for the limited assets excluded from the transaction:

> All non-disclosure or confidentiality agreements, except for those agreements which include non-disclosure or confidentiality obligations for the benefit of [BioElectron] relating to compound numbers EPI-743, EPI-589 and/or EPI-857.
>
> All agreements with law firms (but not, for the avoidance of doubt, any rights with respect to attorney client, work product or other privileges except to the extent relating solely to the negotiation of the transactions contemplated by the Agreement), accounting firms, valuation firms and financial advisors.
>
> All indemnification agreements with current or former officers or directors.
>
> Exit Fee Agreement with Solar Capital dated August 10, 2018.
>
> Letter of Credit with Bridge Bank N.A., dated November 23, 2009, as amended.

(*Id*. at 175.) Further, PTC acquired the right to hire any or all of BioElectron's employees involved in the "research, development, manufacture, distribution, marketing, use and sale of any

2

of the Acquired Compounds," terminable at will. (*Id*. at 97, 112.) The Agreement defines "Acquired Compounds" to mean "the Product and all products, product candidates and development candidates for which any member of the Seller Group [BioElectron] has conducted research, development and/or commercialization activities and which are owned or controlled by any member of the Seller Group [BioElectron], including those set forth on Schedule 2." (*Id*. at 111.) Per Section 5.13 of the Agreement, BioElectron would maintain its corporate existence for a period of 5 years following the transaction. (*Id*. at 98.)

Dr. Gladys Monroy was a patent attorney with the law firm Morrison & Foerster LLP, during which time she was retained as IP counsel for BioElectron. (Dkt. No. 57-2 ¶ 5.) Between 2005 and 2015, she advised BioElectron "on all their IP matters, including patent filings for compositions and methods that allegedly constitute trade secrets in this case." (*Id*.) In preparing her affidavit supporting Defendants' motion to unseal the Complaint, Dr. Monroy relied upon "materials that PTC publicly redacted and lodged under seal," as well as her "decades of experience as an IP attorney in the field of life sciences, and [her] familiarity with public sources of information in the biotechnology and pharmaceutical fields." (*Id*. ¶¶ 13-14.) Her conclusions in the affidavit were based on "[her] training in biochemistry and molecular chemistry, [her] extensive experience in the life sciences specifically related to these topics, and having advised Edison/BioElectron with regards to their IP . . . ." (*Id*. ¶ 17.)

Dr. Monroy provided a second affidavit, filed in support of Defendants' opposition to the motion to disqualify. (Dkt. No. 57-3.) There, she states she does not have access to any of the work she previously did for BioElectron, and she did not "review or rely on any confidential information in forming or stating the opinion set forth in the Affidavit." (*Id*. ¶¶ 2-3.) Prior to reviewing the redacted portions of the Complaint, Dr. Monroy confirms she "executed an Acknowledgment and Agreement to Be Bound ("Acknowledgment"), swearing under penalty of perjury that [she] would keep the redacted portions of the complaint confidential." (*Id*. ¶ 5.) Moreover, she asserts she has not met with or communicated with any attorney from CPM regarding the Complaint and has not shared any materials with the law firm. (*Id*. ¶¶ 6-7.)

Brian Danitz, counsel for Defendants, filed an additional declaration in which he states

3

under penalty of perjury, "[n]o attorney at CPM has ever spoken or otherwise communicated with Dr. Monroy about this case (or, upon information and belief, about anything)." (Dkt. No. 57-1 ¶ 8.) He further attests that, "[o]ther than the Complaint, Dr. Monroy's Affidavit (Ex. 1), Dr. Monroy's Second Affidavit (Ex. 2), and the signed Acknowledgment and Agreement to Be Bound (Ex. 3) [CPM] has not exchanged any materials with Dr. Monroy." (*Id.*) Per the declaration, "Defendants have not and do not intend to retain Dr. Monroy as an expert witness at trial or with respect to this case at large," and CPM has met and conferred with Plaintiff's counsel to confirm there had been "no exchange of confidential information between Dr. Monroy and CPM." (*Id.* ¶¶ 11-12.)

**LEGAL STANDARD**

The power to disqualify an attorney for violation of their ethical responsibilities falls within the discretion of the district court. *See Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1324-25 (9th Cir. 1976). Any such motion to disqualify is governed by the applicable state law. *See In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue.").

Under California law, "'an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any [matter] in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.' . . . [T]he prohibition is in the disjunctive: [the attorney] may not use information or 'do anything which will injuriously affect his former client.'" *Brand v. 20th Century Ins. Co./21st Century Ins. Co.*, 124 Cal. App. 4th 594, 602 (2004) (quoting *People ex rel. Deukmejian v. Brown*, 29 Cal.3d 150, 155 (1981)) (alterations in original). "The scope of an attorney's fiduciary duty may be determined as a matter of law based on the Rules of Professional Conduct which, 'together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which an attorney owes to his [or her] client.'" *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832, 1839-40 (1995), *as modified on*

4

*denial of reh'g* (Aug. 11, 1995) (quoting *Stanley v. Richmond*, 35 Cal.App.4th 1070, 1086-87 (1995)). The duty limiting such conflicts of interest was previously codified at Rule 3-310 of the Rules of Professional Conduct, which has since been amended, and is now incorporated in Rules 1.7 and 1.9. Neither party argues the amendment materially changed the obligations set out in the Rules, and so the Court relies upon interpretations of Rule 3-310 as well.

California courts deploy a "substantial relationship" test when determining whether an attorney must be disqualified from a current representation adverse to a previous client. *See Brand*, 124 Cal. App. 4th at 602. The test "turns on two variables: (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." *Id*. at 603 (citing *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 709 (2003)). As to this variable, the Court considers whether "the relationship between the attorney and the former client is shown to have been direct—that is, where the lawyer was personally involved in providing legal advice and services to the former client . . . ." *Id*. at 604. If such a direct relationship existed, "then it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship." *Id*.

## DISCUSSION

PTC asserts Dr. Monroy must be disqualified as an expert based on her previous role as IP counsel to BioElectron. (Dkt. No. 45 at 7-11.) Further, it argues the conflict of interest between Dr. Monroy and PTC should be imputed to CPM, requiring disqualification of the firm as well. (*Id*. at 12.) In opposition, Defendants contend Dr. Monroy's duty to BioElectron did not transfer to PTC and that no confidential information relevant to this case was transferred to Dr. Monroy. (Dkt. No. 57 at 10-12.) As to disqualification of CPM, Defendants argue no fiduciary relationship ever existed between PTC and CPM that would constitute a conflict of interest, so disqualification would amount to unfair punishment. (*Id*. at 17-22.) The Court addresses each argument in turn.

**I.    MOTION TO DISQUALIFY DR. MONROY AND COTCHETT, PITRE & MCCARTHY, LLP**

To determine whether Dr. Monroy violated the California Rules of Professional Conduct, the Court must first determine whether the privilege passed from BioElectron to PTC as a consequence of the 2019 Assert Purchase Agreement.

". . . [W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985). Certain corporate transactions or occurrences may effect a transfer of the privilege to the successor. *See, e.g., Weintraub*, 471 U.S. at 349 ("New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors."); *see also* Cal. Evid. Code § 953(d) (A holder of the privilege may include: "[a] successor, assign, trustee in dissolution, or any similar representative of a firm, association, organization, partnership, business trust, corporation, or public entity that is no longer in existence."). For instance, a corporate merger or bankruptcy may transfer the privilege. *See Dickerson v. Superior Ct.*, 135 Cal. App. 3d 93, 98 (1982); *Weintraub*, 471 U.S. at 358. That said, the California Court of Appeal has interpreted Section 953 of the Evidence Code—which defines the holder of the privilege—narrowly. *See Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 219 (2010), *as modified on denial of reh'g* (Sept. 22, 2010).

In *Favila v. Katten Muchin Rosenman LLP*, the Court of Appeal considered whether the attorney-client privilege had transferred from one corporation to another following an asset transfer agreement. 188 Cal. App. 4th at 219-20. There, the predecessor corporation sold 100% of its assets to the successor corporation via a Quitclaim Assignment. *Id*. at 200 n.3. A few months after the asset transfer, the predecessor corporation dissolved. *Id*. at 201. Noting that corporate *mergers* result in the transfer of the attorney-client privilege, the court distinguished asset purchases. *Id*. at 219. Indeed, the court observed transfer of the privilege through an asset purchase would contradict the language of Evidence Code Section 952, "which identifies the successor or assign of a corporate entity as the holder of the privilege only when the original

6

1  corporation 'is no longer in existence.'" *Id*. Consequently, the court held even a 100% asset sale
2  would not transfer the privilege to a purchaser corporation. *Id*.

3      *Favila* controls here. Though BioElectron transferred "substantially all of [its] assets" to
4  PTC, it did not transfer all of them. (Dkt. No. 2 at 136, 175.) Moreover, BioElectron was not
5  merged into PTC, as it was required to maintain its corporate existence for 5 years following the
6  transaction. (*Id*. at 98.) The *Favila* court recognized that even a 100% transfer of assets followed
7  by the dissolution of the predecessor corporation within two months did not result in transfer of
8  the privilege. 188 Cal. App. 4th at 219-20. Since the 2019 Asset Purchase Agreement between
9  BioElectron and PTC was not a merger, the attorney-client privilege held by BioElectron
10  regarding Dr. Monroy's representation did not transfer to PTC. Absent an attorney-client
11  relationship between Dr. Monroy and PTC, there is no basis to disqualify Dr. Monroy and no basis
12  to impute a conflict of interest to CPM.

13      On reply, PTC does not address *Favila*; rather, it relies on a "practical consequences" test
14  for determining whether the attorney-client privilege transfers from a predecessor to a purchaser
15  corporation. (Dkt. No. 60 at 5.) In support of this test, PTC cites a number of district court
16  decisions, all of which either pre-date *Favila* or do not consider it. *See Kadrey v. Meta Platforms,*
17  *Inc.*, No. 23-CV-03417-VC (TSH), 2024 WL 3913675, at *1 (N.D. Cal. Aug. 22, 2024) (did not
18  address *Favila*); *STV Asia Ltd. v. PRN Corp.*, No. C-06-1664 JCS, 2006 WL 8460110, at *6 (N.D.
19  Cal. June 22, 2006) (decided before *Favila*); *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, No.
20  3:11-CV-3237-D, 2012 WL 1694084, at *1 (N.D. Tex. May 15, 2012) (did not address California
21  law or *Favila*); *UTStarcom, Inc. v. Starent Networks, Corp.*, No. CIV.A. 07-CV-2582, 2009 WL
22  4908579, at *3 (N.D. Ill. Feb. 20, 2009) (same); *Array Holdings, Inc. v. Safoco, Inc.*, No. CV H-
23  12-0366, 2013 WL 12139272, at *2 (S.D. Tex. Jan. 30, 2013) (same). But the Court cannot ignore
24  decisions of the California Court of Appeal on matters of California state law. *See Ogden Martin*
25  *Sys., Inc. v. San Bernardino Cnty. Cal.*, 932 F.2d 1284, 1288-89 (9th Cir. 1991) ("If no ruling
26  exists from the highest court of the state, [the federal court] must follow intermediate appellate
27  decisions unless convinced by other persuasive data that the highest court of the state would
28  decide otherwise."). *Favila* clearly holds that an asset purchase—even involving 100% of the

1  predecessor corporation's assets—does not transfer attorney-client privilege to the purchasing
2  entity.
3        PTC next argues the express terms of the 2019 Asset Purchase Agreement contemplate
4  transfer of the attorney-client privilege from BioElectron to PTC.  (Dkt. No. 60 at 6.)  Specifically,
5  Schedule 3 to the Agreement did not exclude the transfer of "any rights with respect to attorney
6  client, work product or other privileges except to the extent relating solely to the negotiation of the
7  transactions contemplated by the Agreement."  (Dkt. No. 2 at 175.)  Yet PTC provides no
8  California legal authority to support its suggestion that a corporation can contractually assign the
9  attorney-client privilege to another corporation without merger of the two entities.  As this is
10 PTC's motion to disqualify counsel, it bears the burden of establishing appropriate grounds for
11 disqualification.  *See Bd. of Trs. of Leland Stanford Junior Univ. v. Zhang*, 659 F. Supp. 3d 1061,
12 1067 (N.D. Cal. 2023) (citing *H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d
13 1445, 1452 (1991)) ("The party seeking disqualification bears the burden of establishing the
14 existence of a disqualifying conflict by a preponderance of the evidence.").  PTC has failed to do
15 so.
16       Lastly, PTC contends that even if the privilege did not transfer, it may still move for
17 disqualification based on its significant stake in any breach of a duty owed to BioElectron.  (Dkt.
18 No. 60 at 7.)  In support, PTC cites *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796 (N.D. Cal.
19 2004), but the case is distinguishable.  There, the district court considered whether Concat had
20 standing to bring a disqualification motion based on an attorney's alleged breach of the duty of
21 loyalty to a non-party.  *Id*. at 819.  Law firm Morgan, Lewis represented the defendant, Unilever,
22 and also represented a non-party, which had a financial interest in Concat.  *Id*.  The court
23 determined Concat had Article III standing to bring the motion because the concurrent
24 representation of the non-party and Unilever breached the duty of loyalty, given the non-party's
25 financial relationship with Concat.  *Id*.  However, *Concat LP* differs from the instant case because
26 PTC has not shown that BioElectron has any current stake in PTC.  Moreover, the question of
27 "stake" goes to Article III standing to bring the disqualification motion; it does not, alone,
28 establish a basis for disqualification.  PTC has not argued a basis for, much less shown that, Dr.

8

1  Monroy's affidavit "so infects the litigation in which disqualification is sought that it impacts the
2  moving party's interest in a just and lawful determination of her claims." *Id*. at 818.

## CONCLUSION

For the reasons stated above, PTC's motion to disqualify Dr. Monroy and CPM as well as the motion to strike are **DENIED**. Further, the Court sets the hearing on Defendants' motion to dismiss and motion to unseal the Complaint for January 20, 2026, at 2:00 p.m.

This Order disposes of Docket No. 45.

**IT IS SO ORDERED.**

Dated: November 26, 2025

                                                                         **ARACELI MARTÍNEZ-OLGUÍN**
                                                                         **United States District Judge**