UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PTC THERAPEUTICS, INC.,

Plaintiff,

v.

ACUREX BIOSCIENCES
CORPORATION, et al.,

Defendants.

Case No.  25-cv-04594-AMO

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Re: Dkt. No. 30

**<u>Public Redacted</u>**

Plaintiff PTC Therapeutics, Inc. ("PTC") asserts Defendants AcureX Biosciences Corporation ("AcureX"), Dr. William Shrader, and Dr. Sean Pintchovski misappropriated trade secrets regarding treatment of certain neurodegenerative diseases.  PTC advances six causes of action against Defendants based on these allegations: 1) misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; 2) misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.*; 3) breach of contract by Drs. Shrader and Pintchovski; 4) breach of the implied covenant of good faith and fair dealing by Drs. Shrader and Pintchovski; 5) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; and 6) declaratory judgment against AcureX stating PTC "is the true and lawful owner of all right, title, and interest in" Int'l Pat. Appl. No. PCT/US2023/073312, WO 2024/050513 A1, filed March 7, 2024.  Dkt. No. 2 ¶¶ 153, 160.[1]  Defendants now move to dismiss all six causes of action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Having considered the parties' submissions, and with the benefit of oral argument heard on January 20, 2026, the Court **GRANTS** the motion to dismiss.

**FACTUAL ALLEGATIONS**

This section comprises the well-pleaded allegations from the Complaint, which are taken as true and viewed in the light most favorable to PTC for the purpose of the instant motion. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

"Neurodegenerative diseases like Parkinson's, Alzheimer's, and Friedreich's ataxia are characterized by a progressive loss of neurons in the brain and spinal cord," known as "neurodegeneration." Dkt. No. 2 ¶ 28. At issue in this case are alleged trade secrets involving the development of certain treatments for neurodegeneration. Drs. Shrader and Pintchovski initially worked for BioElectron (formerly known as "Edison Pharmaceuticals, Inc."), where they "played important roles in the research, development, and characterization of the company's lead compound, EPI-743, otherwise known as 'Vatiquinone.'" *Id*. ¶ 3. "Vatiquinone can be used to inhibit 15-lipoxygenase ("15-LO"), an enzyme involved in oxidative stress," which in turn can "protect[] nerve cells and support[] their function against neurodegenerative diseases like Friedreich's ataxia and Parkinson's disease." *Id*. Further, "15-LO activity has been linked to a specific, iron-dependent form of cell death known as ferroptosis." *Id*. ¶ 31. "Ferroptosis is triggered when iron and oxidative stress causes a breakdown in the fats that make up cell membranes." *Id*. By inhibiting 15-LO activity, Vatiquinone, and compounds like it, prove effective in reducing the occurrence of ferroptosis and treating neurodegeneration. *Id*. ¶¶ 30-32.

Given the importance of oxidative stress in the pathology of these conditions, some researchers have focused on treatments involving "redox active small molecules." *Id*. ¶ 32. "These compounds can participate in electron transfer reactions thereby helping cells manage oxidative stress. Depending on their structure, redox active molecules can either increase or decrease the damage caused by oxidative stress. The goal is to therefore identify those molecules that can beneficially interrupt the cycle of inflammation, enzyme overactivity, and cell death." *Id*.

Building on this research, Drs. Shrader and Pintchovski continued to work for BioElectron on the development of a "second generation Vatiquinone," ultimately known as EPI-857

United States District Court
Northern District of California

(Utreloxastat). *Id*. ¶ 7. "In April 2019, PTC acquired substantially all BioElectron assets, including Vatiquinone and EPI-857 (Utreloxastat)." *Id*. ¶ 9. Among these assets was a "chemical library," which BioElectron had previously acquired from Polaroid. *Id*. ¶ 39. This "library" housed the chemical structures of various redox active small molecules that could serve as a starting point for research into other potential treatments for neurodegeneration. *Id*. ¶ 33. Additionally, PTC acquired various proprietary assays from BioElectron. *Id*. ¶ 39. These "[a]ssays measure[d] the biological activity, safety, or effectiveness of drug candidates by evaluating their effects on specific cellular, molecular, or biochemical targets." *Id*. ¶ 34. Combined, the chemical library and assays presented potential leads in new drug development as well as "negative know-how," i.e. which formulations did not achieve the desired effect. *Id*. ¶ 45.

In July 2019, just prior to PTC's acquisition of BioElectron's assets, Dr. Shrader was terminated from his position as Senior Vice President of Innovation. *Id*. ¶ 63. At that time, Dr. Shrader signed a termination letter affirming he would remain bound by two Proprietary Information Agreements he had previously signed—the first, from the start of his employment with BioElectron in 2006, and the second from 2013. *Id*. Both agreements required Dr. Shrader to keep confidential:

> . . . all trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of BioElectron through the Termination Certification.

*Id*.

Shortly after his termination, Dr. Shrader founded his own company, Arviat Pharmaceuticals. *Id*. ¶ 67. At the Biotechnology Innovation Organization's CEO & Investor Conference, Dr. Shrader stated the following on the conference website about the direction of the newly founded Arviat:

> Prior to Arviat, the founder has put three neurodegenerative drugs into the clinical for ALS, Parkinson's disease and orphan pediatric neurodegenerative diseases. One is in development with Sumitomo/Sunovion for ALS and Vatiquinone is in pivotal approval trials with PTC Therapeutics. Arviat's commercial goal is to rapidly

3

> advance a 2nd generation version of Vatiquinone with significantly improved efficacy to treat large populations of Alzheimer's and adult neurodegenerative diseases.

*Id*. In response to these representations, PTC sent a letter to Dr. Shrader. *Id*. ¶ 68. The April 10, 2020 letter instructed him to cease and desist "from any use, transfer, or transaction in any way of any BioElectron confidential proprietary information." *Id*. The letter also noted PTC had recorded Dr. Shrader's "transmission of proprietary and confidential BioElectron materials from [his] company email account to [his] personal email account in the days and weeks prior to [his] separation from BioElectron. These materials included, but were not limited to, highly confidential information regarding the efficacy of EPI-857 for various indications." *Id*. at Ex. 11. That said, the letter did not specify which materials were allegedly transmitted.

On April 24, 2020, Dr. Shrader responded to the letter, denying any use of proprietary or confidential information:

> I have received your letter dated April 10, 2020. I am aware of my obligations to BioElectron. I have not taken or used any proprietary information nor am I aware of any basis for the allegations you have made against me. If you nevertheless believe any of the information I transmitted to my personal e-mail account was confidential or proprietary please let me know what information you are referring to. I am aware only of personal (non BioElectron-related) e-mails and publicly-available materials.

*Id*. at Ex. 12. PTC then sent a second letter, dated April 30, 2020, reiterating its prior concerns and providing two examples of proprietary information transmitted to Dr. Shrader's personal email:

> July 10, 2019 email sent from [Shrader's] BioElectron account to [his] personal email account that included attachments and details regarding BioElectron's interest in developing compounds for Sickle Cell Disease (SCD), and containing details regarding BioElectron's strategy for entering into a collaboration with Global Blood Therapeutics for the development of BioElectron compounds for SCD.

> July 8, 2019 email sent from [Shrader's] BioElectron account to [his] personal email account that contained information regarding a new target that BioElectron should consider pursuing based on BioElectron's proprietary redox chemistry platform and reference material that was obtained using subscription resources made available to [Shrader] by BioElectron.

*Id*. at Ex. 13.  On May 11, 2020, counsel representing Dr. Shrader replied to the letter, denying any misappropriation of proprietary information and stating that "[n]either Mr. Shrader nor Arviat possesse[d] confidential or proprietary information belonging to PTC regardless of its claimed successor in interest status to BioElectron." *Id*. ¶ 71.  The correspondence concluded with a response from PTC, which stated:

> [W]e understand and trust that you, your firm, and your clients have conducted a robust investigation and examination into whether Mr. Shrader or Arviat possess any PTC confidential or proprietary information and concluded that they do not. With this understanding, PTC will rely on your statement and proceed accordingly as may be necessary in the future.

*Id*. at Ex. 15.

In the ensuing months, Arviat ceased operations and was closed by August 2021, at which time Dr. Shrader joined AcureX as its CEO.  *Id*. ¶¶ 72-73.  Immediately thereafter, Dr. Shrader allegedly solicited Dr. Pintchovski to leave BioElectron to join AcureX, which he eventually did.[2] *Id*.  Later, AcureX revealed its lead therapeutic candidate for the treatment of neurodegeneration, a drug labeled CU-13001, which was also designed to inhibit 15-LO.  *Id*. ¶ 76.  PTC alleges CU-13001 was developed within a mere two years, and "AcureX could not have so quickly identified CU-13001 without wrongfully leveraging the confidential and trade secret information of BioElectron/PTC."  *Id*. ¶ 77.

Moreover, PTC alleges Defendants engaged in a scheme to hide the misappropriation by misrepresenting the inventors of certain AcureX patents.  "On October 13, 2022, the World Intellectual Property Organization ("WIPO") published AcureX's patent application PCT/US2022/018682" ("the '682 Application").  *Id*. ¶ 81.  The '682 Application "disclosed certain methods and compositions for the treatment of neurodegenerative disorders like Parkinson's disease," and attributes the invention to Dr. Robert Zahler.  *Id*.  PTC asserts the true inventors of this patented method/composition were Drs. Shrader and Pintchovski.  *Id*. ¶ 84.  This allegation is based on PTC's discovery of a later AcureX patent application from May 10, 2024,

---

[2] At the hearing, Plaintiff confirmed the sequence of these events and that there is a typographical error in the years alleged in the Complaint.

known as PCT/US2023/078151 (the "'151 Application"), which attributes invention to Drs. Shrader and Pintchovski. *Id*. ¶ 82. The International Searching Authority assessed the '151 application and determined its claims "were anticipated by AcureX's earlier '682 Application." *Id*. ¶ 83. Since the claims of the '682 application lacked novelty, PTC avers: "Either Dr. Zahler invented both applications, or Drs. Shrader and Pintchovski were intentionally and fraudulently omitted as inventors from the '682 Application." *Id*. ¶ 84.

Lastly, PTC refers to a third patent application by AcureX—PCT/US2023/073312 ("the '312 Application")—which allegedly indicates misappropriation. The '312 Application was published by WIPO on March 7, 2024, and disclosed an invention involving "phenothiazine compounds substituted by a bicyclic nitrogen-containing heterocyclic ring, and compositions and methods thereof." *Id*. ¶ 86. Further, the '312 Application described "a phenothiazine resorufin compound expressly targeting 15-LO and ferroptosis for purposes of treating neurodegenerative diseases." *Id*. PTC alleges this chemical structure was derived from Defendants' misappropriation of BioElectron trade secrets that had been sold to PTC. *Id*.

**LEGAL STANDARD**

"To survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014) (cleaned up). The district court must assume that the plaintiffs' allegations are true and draw all reasonable inferences in their favor. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022). However, the court need not construe conclusory statements or unreasonable inferences as true. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Further, since PTC asserts certain claims sounding in fraud, the Complaint must comply with the heightened pleading standard of Federal Rule of Civil Procedure 9(b) as to those claims. *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024). To comply with this standard, "the complaint must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Id*. (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018)).

United States District Court
Northern District of California

"If the court finds that dismissal pursuant to Rule 12(b)(6) is warranted, the 'court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Access Optical Networks, Inc. v. Seagate Tech. LLC*, No. 24-CV-03745-EKL, 2025 WL 240799, at *3 (N.D. Cal. Jan. 17, 2025) (citing *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).

**DISCUSSION**

**I.    TRADE SECRET MISAPPROPRIATION CLAIMS**

PTC brings claims against Defendants under both federal and state trade secret misappropriation statutes. To advance a trade secret misappropriation claim under DTSA, the plaintiff must plausibly allege: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)). "[T]he definition of what may be considered a 'trade secret' is broad," and includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

*Id*. at 657. Further, "[t]he information must 'derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information.'" *Id*. (citing 18 U.S.C. § 1839(3)).

Courts typically analyze claims under DTSA and CUTSA together as their elements are substantially similar. *See id*. However, the Ninth Circuit has recently noted an important distinction between the two statutes. In *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1089 (9th Cir. 2025), the court held DTSA differed from CUTSA in that it "does not set out requirements for the specific timing or scope for identifying trade secrets. Instead, the conventional procedures under the Federal Rules of Civil Procedure apply." Further, the court

7

clarified that whether a plaintiff has identified their trade secrets with sufficient particularity is a question of fact that should be resolved on summary judgment or at trial. *Id*. at 1091. Accordingly, the level of specificity required in delineating a plaintiff's trade secrets at the pleading stage differs depending on whether the claim arises under DTSA or CUTSA.

### A.   Federal Defend Trade Secrets Act Claim

The Court addresses only the parties' arguments as to the first and second elements of the DTSA trade secret misappropriation claim, since the motion may be resolved on those grounds alone.

### 1.   Whether PTC plausibly alleges possession of a trade secret.

"[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC*, 978 F.3d at 657 (citing 18 U.S.C. §§ 1839(3), (5)).  A plaintiff "must '*clearly refer* to tangible trade secret material' instead of referring to a 'system which *potentially* qualifies for trade secret protection.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (emphasis in original).  Moreover, "[t]he plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Id*. at 1164-65. "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial," nor is it sufficient to "cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information." *InteliClear, LLC*, 978 F.3d at 658 (citations omitted).  Ultimately, the plaintiff bears the burden of sufficiently identifying the trade secrets and showing they exist. *Id*. (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)).

Here, PTC identifies five alleged trade secrets: 1) ██████████████████████ in the Polaroid Library exhibited anti-ferroptotic effects, ████████████████████████ ██████████████████████████████████████████████████████ " Dkt. No. 1 ¶ 59; 2) ████████████████████████████████████████████████ ████████████████████████████, *id*. ¶ 60; 3) The Polaroid Library contains other

molecules that inhibit 15-LO and protect against ferroptosis, which can be useful in the treatment of neurodegeneration, *id*.; 4) "EPI-743/Vatiquinone and EPI-857/Utreloxastat have significant biological effect in Parkinson's disease," *id*.; and 5) Negative know-how acquired by Drs. Shrader and Pintchovski during their time at BioElectron, which helped to accelerate drug development at AcureX, *id*. ¶ 77.  The Court addresses the latter three allegations first, since each fails to permit a reasonable inference of PTC's possession of a trade secret.

To start, PTC's assertion that the existence of the Polaroid Library and of other molecules that can inhibit 15-LO are "trade secrets" fails to satisfy the statutory definition of a trade secret. This information is neither unknown to others nor has PTC attempted to keep it secret, given it features prominently in unredacted portions of the Complaint.  *See* 18 U.S.C. §§ 1839(3), (5). Immediately after discussing the Polaroid Library and the "redox active small molecules" contained therein, PTC alleges "BioElectron then identified small molecules capable of modulating oxidative stress, inhibiting 15-LO, and protecting against ferroptosis."  Dkt. No. 2 ¶ 37.  The biological mechanism by which inhibiting 15-LO can reduce ferroptosis and ameliorate neurodegeneration is not confidential; indeed, various paragraphs throughout the Complaint lay out this exact scientific background.  *See, e.g.*, Dkt. No. 2 ¶¶ 2-7, 30-34, 37-38.  The Complaint also refers frequently to the existence of the Polaroid library and other potential 15-LO inhibiting molecules therein.  *See, e.g.*, *id*. ¶¶ 33, 37, 53.  Perhaps the identities of those specific molecules would constitute a trade secret.  But PTC does not allege anything with respect to those molecules, nor whether Drs. Shrader or Pintchovski misappropriated any information on a particular molecule.  Though "a plaintiff need not 'spell out the details of the trade secret,'" it must still provide sufficient factual allegations to distinguish the alleged secret from matters of general knowledge and permit the defendant to ascertain its boundaries.  *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) (citing *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015)).  PTC has not done so here.

Regarding the fourth and fifth alleged trade secrets, PTC fares no better.  To the extent PTC suggests it is a trade secret that Vatiquinone or Utreloxastat have a biological effect on Parkinson's disease, the Complaint's allegations reject that assertion.  At various times, in

9

unredacted portions of the Complaint, PTC explains the mechanism of these drugs and the reason for their pharmaceutical success:

> Vatiquinone protects nerve cells and supports their function against neurodegenerative diseases like Friedreich's ataxia and Parkinson's disease. Dkt. No. 2 ¶ 3.

> Drs. Shrader and Pintchovski were involved in the specific development of both in vitro and in vivo studies (studies both inside and outside the body) to identify the potential of affecting Parkinson's through 15-LO inhibition, including reducing microglial activation. *Id*. ¶ 4.

> BioElectron's lead compound, Vatiquinone, exemplified this approach. Vatiquinone is a targeted redox modulator that addresses the underlying oxidative and inflammatory damage seen in diseases like Friedreich's ataxia, Parkinson's, and inherited mitochondrial disorders. *Id*. ¶ 38.

PTC has made clear that Vatiquinone's effect on 15-LO inhibition, and on the neurodegeneration present in Parkson's disease, are "matters of general knowledge in the trade." *Imax Corp.*, 152 F.3d at 1167. As to Defendants' "negative know-how," PTC fails to provide any factual allegations to shed light on its contours. PTC merely alleges Drs. Shrader and Pintchovski acquired "negative know-how" by virtue of their work at BioElectron, and that "AcureX could not have so quickly identified CU-13001" without leveraging this know-how. Dkt. No. 2 ¶ 77. These conclusory statements do not indicate any specific, tangible trade secret material possessed by Drs. Shrader or Pintchovski, but rather point to a "system which *potentially* qualifies for trade secret protection." *Imax Corp.*, 152 F.3d at 1167. This catchall-phrase approach to pleading is insufficient to advance a misappropriation claim, absent additional detail to put Defendants on notice of the claims against them. *InteliClear, LLC*, 978 F.3d at 658; *see also Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (dismissing trade secret claims when the plaintiff has used only categories to describe the alleged trade secrets, including "negative know-how").

The remaining two alleged trade secrets do not suffer from this same infirmity. PTC identifies two further pieces of confidential information not extensively discussed in unredacted portions of the Complaint: first, ████████████████████████

████████████████████████████████████████

██████ and second, ████████████████████████████████

████████████████████████████████. Dkt. No. 1 ¶¶ 59-60. By explaining the chemical quality or biological mechanism that forms the basis of the trade secret, PTC permits Defendants to identify and respond to the claims asserted against them. Thus, with regard to these two alleged trade secrets, PTC has satisfied its burden at the pleading stage to articulate its trade secrets such that "the defendant [can] ascertain at least the boundaries within which the secret lies." *Vendavo, Inc.*, 2018 WL 1456697, at *4 (citation omitted).

In response, Defendants contend these two alleged trade secrets involving resorufins and Vatiquinone have been published in publicly available scientific literature, and so are not trade secrets. *See* Dkt. No. 29-2 at 22-24. To support this argument, Defendants request judicial notice of 26 exhibits they claim illustrate the public availability of the alleged trade secrets. *See* Dkt. No. 30-1. Among these exhibits are various scientific articles, webpages, and patent applications. *Id*. Pursuant to Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts often take judicial notice of "matters of public record" and court filings. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). But critically, "a court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Though the Court takes judicial notice of the *existence* of these various articles, it cannot take notice of the *facts* therein because the parties dispute whether the contents of those articles disclose the alleged trade secrets in this case. *See CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019) (holding judicial notice of scientific articles to determine whether an alleged trade secret was public knowledge was inappropriate). Defendants cannot use a request for judicial notice to circumvent the Ninth Circuit's determination that whether the plaintiff's trade secrets have been described with "sufficient particularity" is a question of fact reserved for summary judgment or trial. *Quintara Biosciences, Inc.*, 149 F.4th at 1089. So, the Court must await a more fulsome factual record before deciding whether PTC's

alleged trade secrets comprise solely information contained in public scientific literature, or if they can be further particularized to fall within the ambit of DTSA.

### 2. Whether PTC plausibly alleges misappropriation.

For purposes of pleading a claim under DTSA, PTC has plausibly alleged possession of two trade secrets, as discussed in the Court's analysis, *supra*. However, for those alleged trade secrets, PTC has failed to plausibly allege misappropriation by Dr. Shrader, Dr. Pintchovski, or AcureX.

"Under both the DTSA and the CUTSA, 'misappropriation' means either (1) the '[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or (2) the '[d]isclosure or use of a trade secret of another without express or implied consent.'" *Alta Devices, Inc.*, 343 F. Supp. 3d at 877 (quoting 18 U.S.C. § 1839(5) and Cal. Civ. Code § 3426.1(b)). Here, PTC has offered only scant allegations as to misappropriation that do not permit a reasonable inference of statutory violation.

To establish misappropriation, PTC relies heavily on a series of conclusory allegations based on impermissible inferences. PTC alleges both Dr. Shrader and Dr. Pintchovski had access to BioElectron trade secrets during their employment there, and they *must* have misappropriated those secrets when they were later hired by AcureX because CU-13001 was developed in only two years. Dkt. No. 2 ¶¶ 57-59, 77-79. To wit: Drs. Shrader and Pintchovski were working on 15-LO inhibitors at BioElectron, therefore, any work on 15-LO inhibitors for AcureX must have involved misappropriation. This is a classic "inevitable disclosure doctrine" argument—a doctrine that permits an inference of misappropriation when an employee's roles at two different companies "were so similar that 'it would be impossible for an employee to perform his or her new job without using or disclosing those trade secrets.'" *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 708 (9th Cir. 2003) (citation omitted). Such a theory has been rejected under both DTSA and CUTSA as an impermissible covenant not to compete. *See id.* (citing *Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 125 Cal.Rptr.2d 277, 294 (Ct.App.2002) ("[T]he only published California decision addressing the inevitable disclosure doctrine held that 'the inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade

secrets.'"); *Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) ("To the extent that the theory of inevitable disclosure creates a de facto covenant not to compete without a nontrivial showing of actual or threatened use or disclosure, it is inconsistent with California law."); *see also* 18 U.S.C. § 1836(b)(3)(A)(i)(I) ("[A] court may grant an injunction to prevent any actual or threatened misappropriation . . . *provided the order does not prevent a person from entering into an employment relationship . . . .*" (emphasis added)). Accordingly, PTC's conclusory allegations, alone, cannot permit a plausible inference of misappropriation.

As to Dr. Shrader, PTC offers an additional factual allegation. In a letter dated April 30, 2020, PTC identified two emails Dr. Shrader sent to his personal email account: one involving compounds for Sickle Cell Disease, the other including information about "a new target that BioElectron should consider pursuing based on BioElectron's proprietary redox chemistry platform and reference material that was obtained using subscription resources made available to [Shrader] by BioElectron." Dkt. No. 2 at Ex. 13. PTC's complaint lacks allegations regarding the import of these emails to the alleged trade secrets at issue, a necessity given the topics covered in those emails seem superficially irrelevant. To advance a misappropriation claim, PTC must provide factual allegations, not mere conjecture based on an inevitable disclosure theory.

In opposition, PTC cites *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868 (N.D. Cal. 2018), for the proposition that similarity between its product and AcureX's product is enough to permit an inference of misappropriation. *See* Dkt. No. 47-3 at 17-18. PTC misunderstands *Alta Devices, Inc.* There, the court held the plaintiff had plausibly alleged misappropriation when it provided details of both the similarity between the products at issue as well as "allegations of exactly how defendants *improperly* obtained the alleged trade secrets." *Alta Devices, Inc.*, 343 F. Supp. 3d at 883 (emphasis added). The defendant company in *Alta Devices, Inc.* had entered into an NDA with the plaintiff company in order to learn about their technology, and then subsequently stated an intention to develop that technology "in-house." *Id*. at 884. There is no similar transaction between two competing companies alleged here. Unlike in *Alta Devices, Inc.*, it is not "improper" for an employee like Dr. Shrader to move to an employer in the same industry.

13

Absent any other factual allegations establishing improper means of acquiring PTC's trade secrets, mere similarity between CU-13001 and Vatiquinone is not sufficient to state a claim.

For these reasons, Defendants' motion to dismiss the DTSA claim is **GRANTED**.

### B.    California Uniform Trade Secrets Act Claim

As the Court described above, the elements of a DTSA claim and a CUTSA are similar, except when analyzing whether the plaintiff has stated its trade secrets with sufficient particularity. *See* Section I, *supra*.  As to that analysis, DTSA is more permissive than CUTSA, which requires trade secrets be identified with "reasonable particularity" prior to initiation of discovery.  *See* Cal. Civ. Proc. Code § 2019.210.  Otherwise, courts typically examine both claims in tandem. *InteliClear, LLC*, 978 F.3d at 657.  Consequently, the Court's analysis of DTSA applies with equal, if not greater, force to PTC's claims under CUTSA, since the CUTSA standard is more demanding.

So, the Defendants' motion to dismiss the CUTSA claim is similarly **GRANTED**.

## II.    BREACH OF CONTRACT CLAIMS

Turning to the breach of contract claims, PTC alleges Drs. Shrader and Pintchovski violated the terms of the Proprietary Information Agreements they signed with BioElectron/Edison Pharmaceuticals, which were acquired by PTC.  PTC also asserts Defendants violated the implied covenant of good faith and fair dealing by misrepresenting Dr. Shrader's and Dr. Pincthovski's role in the '682 Application to hide their alleged breach of the contracts.

Per the Governing Law Provisions of the agreements, California law applies.  Dkt. No. 2 at Exs. 5, 6.  Accordingly, "[t]o state a claim for breach of contract, the plaintiff must plausibly allege '(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.'"  *Access Optical Networks, Inc.*, 2025 WL 240799, at *5 (citing *Oasis W. Realty LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011)).  Separately, "to establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: '(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and

14

(5) the plaintiff was harmed by the defendant's conduct.'" *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *48 (N.D. Cal. Aug. 30, 2017) (citation omitted).

PTC's factual basis for asserting a breach of the Proprietary Information Agreements is the same as its basis for alleging misappropriation of trade secrets—that is, Drs. Shrader and Pintchovski utilized PTC's confidential information to assist AcureX in developing CU-13001. As discussed in the Court's analysis of those trade secret claims, PTC has not plausibly alleged Defendants misappropriated any confidential, proprietary information. Consequently, PTC has also failed to plausibly allege a breach of the Proprietary Information Agreements.

As for the alleged breach of the covenant of good faith and fair dealing, PTC asserts a separate factual basis in Defendants' alleged misrepresentations about the inventorship of the '682 Application. Here, too, PTC does not allege facts sufficient to permit a reasonable inference of breach. Because of the similarities between '682 Application and the '151 Application, PTC assumes "[e]ither Dr. Zahler invented both applications, or Drs. Shrader and Pintchovski were intentionally and fraudulently omitted as inventors from the '682 Application." Dkt. No. 2 ¶ 84. To the extent PTC asserts a claim sounding in fraud, these allegations regarding AcureX's patent applications do not provide enough detail to satisfy Federal Rule of Civil Procedure 9(b). Indeed, under PTC's theory, Dr. Zahler could have invented both applications, in which case PTC has not been harmed, considering it has no contractual relationship with Dr. Zahler. Regardless, the Complaint's theory of misrepresentation relies on fundamentally unreasonable inferences. A finding that the '151 Application did not describe a novel invention compared to the '682 Application does not imply they were invented by the same person. It simply means the proposed invention was anticipated by a single prior art reference. Patent applications attempt to expand upon or subtly alter prior art, and often fail to establish novelty, but that does not mean the new inventor and the old inventor are the same individual. In sum, novelty and inventorship are different components of a patent application.

To advance this theory of misrepresentation, PTC must present specific factual allegations explaining Dr. Shrader's and Dr. Pintchovski's involvement in the '682 Application and how they

United States District Court
Northern District of California

15

went about fraudulently obscuring their role.  Since, PTC has failed to do so here, Defendants' motion to dismiss the breach of contract claims and the breach of the implied covenant of good faith and fair dealing claim is **GRANTED**.

### III.   UCL CLAIM

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  The factual basis for PTC's UCL claim is identical to the alleged misrepresentation of inventorship that underlies its claim for breach of the implied covenant of good faith and fair dealing.  *See* Dkt. No. 47-3 at 21.  For the reasons described in the Court's resolution of that contract claim, PTC's UCL claim similarly fails.

Therefore, Defendants' motion to dismiss the UCL claim is **GRANTED**.

### IV.   DECLARATORY JUDGMENT

Lastly, PTC seeks declaratory judgment against AcureX, establishing PTC "is the true and lawful owner of all right, title, and interest in" Int'l Pat. Appl. No. PCT/US2023/073312, WO 2024/050513 A1, filed March 7, 2024.  Dkt. No. 2 ¶¶ 153, 160.  However, "[t]he Declaratory Judgment Act does not provide a cause of action when a party . . . lacks a cause of action under a separate statute and seeks to use the Act to obtain affirmative relief.  The availability of relief under the Declaratory Judgment Act 'presupposes the existence of a judicially remediable right.'" *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022).  Since the Court has dismissed all other pending claims asserted by PTC, declaratory relief is not available.

### V.   LEAVE TO AMEND

"Generally, Rule 15 advises the court that leave shall be freely given when justice so requires.  This policy is to be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotations and citations omitted).  Courts may deny leave to amend "only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (modification in original).

United States District Court
Northern District of California

16

At this stage, the Court cannot determine as a matter of law that amendment would prove futile. PTC may still be able to proffer factual allegations to define its trade secrets with sufficient particularity and establish a plausible inference of misappropriation. Given the extreme liberality with which the Court must apply Rule 15, the Court grants PTC leave to amend.

## VI.    SEALED MATERIAL

This order will remain provisionally under seal until February 6, 2026. Should either party seek to seal any portion of this order, they shall jointly prepare and file an administrative motion to seal, in accordance with Civil Local Rule 79-5, by no later than February 2, 2026. If a sealing motion is not filed by that date, the Court will unseal this order in its entirety.

### CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' motion to dismiss. PTC is granted leave to amend all claims. Should PTC choose to amend, the Amended Complaint must be filed no later than February 20, 2026. No parties or claims may be added without leave of Court or stipulation of Defendants.

**IT IS SO ORDERED.**

Dated: February 9, 2026

ARACELI MARTÍNEZ-OLGUÍN
United States District Judge

United States District Court
Northern District of California

17