United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PTC THERAPEUTICS, INC.,<br>Plaintiff,<br>v.<br>ACUREX BIOSCIENCES CORPORATION, et al.,<br>Defendants. | Case No. 25-cv-04594-AMO<br>**ORDER RE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br>Re: Dkt. No. 99<br>**PUBLIC REDACTED** |

Plaintiff PTC Therapeutics, Inc. ("PTC") asserts Defendants AcureX Biosciences Corporation ("AcureX"), Dr. William Shrader, and Dr. Sean Pintchovski misappropriated trade secrets regarding treatment of certain neurodegenerative diseases. The Court granted Defendants' first motion to dismiss the complaint, and granted PTC leave to amend. Dkt. No. 89.

On amendment, PTC has dropped its claim under the California Uniform Trade Secrets Acts, and so the following causes of action remain: 1) misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq.; 2) breach of contract by Drs. Shrader and Pintchovski; 3) breach of the implied covenant of good faith and fair dealing by Drs. Shrader and Pintchovski; 4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; and 5) declaratory judgment against AcureX stating PTC "is the true and lawful owner of all right, title, and interest in" Int'l Pat. Appl. No. PCT/US2023/073312, WO 2024/050513 A1, filed March 7, 2024. Dkt. No. 91-3 ¶ 193. In the alternative, PTC seeks an order "reassigning all rights in the disputed patent application and all patents issuing therefrom to PTC" or a declaration that PTC is a "co-owner" of the patent. *Id.*

Having considered the parties' submissions, and with the benefit of oral argument, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

**FACTUAL ALLEGATIONS**

The Court previously granted Defendants' first motion to dismiss. *See PTC Therapeutics, Inc. v. AcureX Biosciences Corp.*, No. 25-CV-04594-AMO, 2026 WL 350772, at *1 (N.D. Cal. Feb. 9, 2026). On the question of whether PTC had plausibly alleged possession of a trade secret, the Court determined two of the five alleged secrets satisfied the pleading requirement. *Id.* at *5 - *7. However, on the element of misappropriation, PTC offered only conclusory allegations and failed to carry its burden. *Id.* at *7 - *8. PTC's remaining claims failed, in large part, due to the absence of plausibly alleged misappropriation. As amended, the FAC now expands the list of alleged trade secrets and supplements the allegations of misappropriation. The Court assumes familiarity with its prior order, and therefore, recounts only those well-pleaded supplemental allegations.

Previously, the Court held PTC had plausibly alleged the existence of two trade secrets: (1) Certain [redacted] in the Polaroid Library [redacted] and (2) [redacted] Dkt. No. 80 at 8. The FAC now alleges three additional trade secrets:

> (1) [PTC's] discoveries relating to [redacted] including the SAR knowledge and characteristics that make it among the [redacted] yet discovered and a potential [redacted] (2) its proprietary assay cascade, used collectively, to make those discoveries, and (3) the know-how and negative know-how relating to these discoveries and compound identification.

Dkt. No. 105-3 at 10-11. PTC also describes [redacted] as the "Proprietary Structural Motif," which exists within the chemical structure of numerous other compounds identified and logged within PTC's "internal compound library." Dkt. No. 91-3 ¶ 79. By testing these compounds using the proprietary assay cascade, PTC determined many of them exhibited potent anti-ferroptotic effects that were "exceptional in the field of neurodegenerative research." *Id.* For instance, PTC determined a compound labeled [redacted]—known externally as [redacted]—showed [redacted]. *Id.* As alleged, this usage of

United States District Court
Northern District of California

the compound was not widely known in the industry. *Id.*

The FAC also contains analysis from Dr. Derek Pratt, Professor of Chemistry and Biomolecular Sciences at the University of Ottawa. *Id.* ¶ 129. As alleged, "resorufin-based scaffolds and their ferroptosis-related activity have been discussed in the scientific literature prior to – and since – ferroptosis was first described in approximately 2012 . . . ." *Id.* However, the application of PTC's Proprietary Structural Motif as a [redacted] was not a "straightforward inference from the general literature." *Id.* Similarly, in the case of [redacted]—known as [redacted]—published studies had explored chemical modifications to its structure, but did not indicate the compound could [redacted] *Id.*

Regarding the proprietary assay cascade, PTC allegedly acquired the assays from BioElectron, and they are used to investigate new compounds and "optimize their efficacy as a drug." *Id.* ¶ 80. PTC identifies twenty assays, including: "A high-throughput, ferroptosis cell-survival assay, used as BioElectron's Tier 1 primary screening assay; [and] [p]roprietary neuronal culture systems and downstream functional assays (spearheaded by Dr. Pintchovski) used to validate anti-ferroptotic and 15 LO inhibitory activity in neuronal contexts." *Id.* Drs. Shrader and Pintchovski were either involved in the development of, or have deep knowledge of, the twenty assays. *Id.* Though PTC notes "some of these assays could be developed with knowledge from an exhaustive review of published literature, . . . [t]he knowledge of the entire assay cascade (collectively) and how to apply it to identify and optimize a lead compound is a closely held trade secret." *Id.* The allegations regarding Dr. Pratt's analysis also go to this point. In that analysis, Dr. Pratt indicates "many ferroptosis and LO-based assays are known in the art and used by research groups," but the specific assay cascade utilized by BioElectron was neither publicly disclosed nor ascertainable. *Id.* ¶ 129.

As for know-how, PTC alleges Drs. Shrader and Pintchovski acquired certain knowledge through their exposure to the alleged trade secrets, such as how to: "(i) induce ferroptosis, (ii) measure protection against ferroptotic cell death, and (iii) use tiered screening assays to rapidly identify and optimize lead compounds for 15-LO inhibition." *Id.* ¶ 18. Peppered throughout the

United States District Court
Northern District of California

FAC are additional mentions of "know-how," particularly as to the other alleged trade secrets. *See, e.g.*, *id.* ¶¶ 79-80, 90, 109.

Turning to the element of misappropriation, PTC alleges Drs. Shrader and Pintchovski were directly involved in BioElectron's therapeutic drug, Utreloxastat, which was described as a "second-generation" Vatiquinone. *Id.* ¶ 91. Part and parcel to this work was their access to, and knowledge of, the alleged trade secrets. *Id.* ¶¶ 85-89. Once Drs. Shrader and Pintchovski commenced work at AcureX, PTC alleges they utilized trade secret information to accelerate the development of the compound CU-12991 and the drug candidate CU-13001. *Id.* ¶ 109. The FAC refers to certain AcureX patent applications, which PTC avers contain the trade secrets described previously. *Id.* ¶ 112. For example, PTC cites patent application PCT/US2023/078151 (the "'151 Application"), which lists Drs. Shrader and Pintchovski as inventors, and discloses a compound "structure that is highly similar to BioElectron/PTC's Proprietary Structural Motif compounds and derivatives." *Id.* ¶ 115. Specifically, PTC notes [redacted] *Id.* ¶ 116.

Moreover, in patent application PCT/US2023/073312 (the "'312 Application"), AcureX allegedly disclosed PTC's trade secret involving the effect of [redacted] *Id.* ¶ 120. This patent application also included a compound structure which allegedly replicates the structure of [redacted]. *Id.* ¶ 122. Last, PTC cites patent application PCT/US2025/033092 (the "'092 Application"), which discloses AcureX's compound, CU-12991. *Id.* ¶ 125. As in the '312 and '151 applications, CU-12991 allegedly exhibits the same Proprietary Structural Motif identified as PTC's trade secret. *Id.* ¶¶ 125-27.

**LEGAL STANDARD**

"To survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014) (cleaned up). The district court must assume that the plaintiffs' allegations are true and draw all reasonable inferences in their favor. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022). However, the court need not construe conclusory statements or unreasonable inferences as true. *In*

*re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

The Court first addresses PTC's DTSA claim, before turning to the contract claims and UCL claim. Last, the Court reviews PTC's request for declaratory relief.

## I. DEFEND TRADE SECRETS ACT CLAIM

To advance a trade secret misappropriation claim under DTSA, the plaintiff must plausibly allege: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)). "[T]he definition of what may be considered a 'trade secret' is broad," and includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

*Id.* at 657. Further, "[t]he information must 'derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information.'" *Id.* (citing 18 U.S.C. § 1839(3)).

The Court examines only the first two elements of the claim, since the parties have not raised any arguments as to whether the alleged conduct "caused or threatened damage" to PTC. *Id*. at 658.

### A. Possession of a Trade Secret

"[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC*, 978 F.3d at 657 (citing 18 U.S.C. §§ 1839(3), (5)). "[T]rade secret cases present . . . a 'delicate problem.'" *Joby Aero, Inc. v. Archer Aviation Inc.*, No. 25-CV-10703-SVK, 2026 WL 1625376, at *8 (N.D. Cal. June 5, 2026) (quoting *Quintara Biosciences, Inc. v. Ruifeng*

*Biztech, Inc.*, 149 F.4th 1081, 1089 (9th Cir. 2025)). "How can plaintiffs plead, discover, and prove whether a trade secret has been misappropriated without giving away the trade secret? On the other hand, how can defendants respond to discovery without giving away their own trade secrets?" *Id.* (citation omitted). "Courts have struck a balance in addressing this 'delicate problem' by holding that at the pleading stage, the DTSA does not require a plaintiff to 'spell out the details' of every conceivable trade secret." *Mattson Technology, Inc. v. Applied Materials, Inc.*, No. 23-cv-06071-SVK, 2026 WL 1303361, at *3 (N.D. Cal. May 12, 2026). At the same time, a plaintiff "must '*clearly refer* to tangible trade secret material' instead of referring to a 'system which *potentially* qualifies for trade secret protection.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (emphasis in original). Further, "[t]he plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Id.* at 1164-65. "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial," nor is it sufficient to "cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information." *InteliClear, LLC*, 978 F.3d at 658 (citations omitted). Ultimately, the plaintiff bears the burden of sufficiently identifying the trade secrets and showing they exist. *Id.* (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)).

As previously noted, PTC alleges three additional trade secrets in the FAC: 1) the use of the Proprietary Structural Motif compounds, as exemplified in [redacted] Dkt. No. 91-3 ¶ 79; 2) knowledge and use of the proprietary assay cascade, which comprises twenty discrete assays for studying new compounds and optimizing their efficacy, *id.* ¶ 80; and 3) know-how about ferroptosis and tiered assays, *id.* ¶ 18. Here, PTC has carried its burden as to the first two alleged secrets, but fails to do so as to the third.

The FAC provides an array of allegations that establish the contours of the Proprietary Structural Motif trade secret. PTC identifies its chemical structure, the location of certain atoms in [redacted], and clarifies the alleged secret is not the structure itself, but rather the use of

such compounds [redacted]. *See id.* ¶ 79. Additionally, PTC notes the [redacted] the Proprietary Structural Motif compounds have exhibited along this biological pathway. *Id.* As a specific example of the Proprietary Structural Motif, PTC alleges no published study had [redacted]. *Id.* PTC asserts various research materials dating back to 2018 show BioElectron had identified this capability of the Proprietary Structural Motif under Dr. Shrader's supervision. *Id.* This level of information suffices to notify Defendants of the boundaries of the alleged secret without requiring PTC to give away its own secrets. *See Joby Aero, Inc.*, 2026 WL 1625376, at *8 (citing *Quintara Biosciences, Inc.*, 149 F.4th at 1089).

Similarly, with respect to the proprietary assay cascade, PTC has plausibly alleged a trade secret. PTC supplies a table of the twenty assays comprising the cascade. Dkt. No. 91-3 ¶ 80. The table includes the name of the assay, a description of its purpose in the cascade, and the level of involvement Drs. Shrader and Pintchovski had in its development. *Id.* Further, PTC does not contend the individual assays are each a trade secret, but rather the collective use of the twenty in a process to discover new potential compounds is proprietary. *Id.* The mere possibility that an individual assay could be derived from a review of relevant scientific literature does not exclude trade secret protection, since "[t]rade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets." *Buffets, Inc. v. Klinke*, 73 F.3d 965, 968 (9th Cir. 1996). Here, given the specificity of PTC's assay cascade allegations, Defendants can certainly "ascertain at least the boundaries within which the secret lies." *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018).

Defendants counter with two main arguments, but neither persuades. First, Defendants assert the use of the Proprietary Structural Motif in [redacted] is not secret because it was publicly disclosed in prior BioElectron patents that were ultimately abandoned. Dkt. No. 98-3 at 16. Schedule 2.15a to the Asset Purchase Agreement includes a list of dozens of patents and trademarks, including their status at the time of the Agreement. Dkt. No. 91-3 at 304. The Schedule notes the abandoned patents, *id.* at 344, and Defendants request

judicial notice of the patents themselves, Dkt. No. 99-1. This is not an argument suited to a Rule 12(b)(6) motion. As addressed in the Court's prior order, judicial notice is not appropriate for disputed facts contained within a document. *See PTC Therapeutics, Inc.*, 2026 WL 350772, at *7 (citing *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019)) (observing judicial notice of scientific articles to determine whether an alleged trade secret was public knowledge was inappropriate). Though the FAC includes the Asset Purchase Agreement, it does not include the details of the abandoned patents listed in Schedule 2.15a. Whether PTC's alleged trade secret was publicly known through these abandoned BioElectron patents is a factual question to be adjudicated at summary judgment, not on a motion to dismiss. *See AllRounds, Inc. v. Eshares, Inc.*, No. 20-cv-07083-VC, 2021 WL 2945532, at *1 (N.D. Cal. July 14, 2021) ("The question whether alleged trade secrets are disclosed in a patent application . . . may be beyond the scope of a motion to dismiss when there are factual disputes about the extent of the disclosure or what is encompassed by the claimed secrets." (citation omitted).).

Second, Defendants argue PTC has failed to plausibly allege the trade secrets have independent economic value from being kept secret. Specifically, Defendants contend the Asset Purchase Agreement between PTC and BioElectron does not state PTC paid for the Proprietary Structural Motif or assay cascade. Dkt. No. 109-3 at 13. The Court disagrees. To start, Section 1.1(a) of the Agreement states PTC purchased the "Acquired Assets" in exchange for monetary consideration, assumption of certain liabilities, and potential contingency payments. Dkt. No. 91-3 at 116. Section 9.1(a) defines "Acquired Assets" as including "all Intellectual Property," *id*. at 171, which itself includes "trade secrets," *id*. at 179. Accordingly, a reasonable inference to be drawn from the language of the Agreement is that PTC paid for the information and techniques that constitute the trade secrets alleged here. But even absent the terms of the Agreement, PTC separately alleges these trade secrets "eliminated critical stages of trial-and-error research," and "allowed AcureX to bypass failed candidates," which "would have required years of exploratory research and substantial additional investment." *Id*. ¶ 129. "Although 'the standard to show that trade secrets derive [independent] economic value is not a high standard,' courts recognize that merely reciting this element in a pleading is insufficient to state a claim for trade secret

misappropriation." *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (internal citations omitted). PTC's allegations overcome the pleading requirement because they articulate the market advantage AcureX stood to gain from utilizing the alleged trade secrets. *See, e.g.*, *MAI Sys. Corp.*, 991 F.2d at 521 (holding a plaintiff had shown economic value of a "Customer Database" because a competitor could target more customers in the market by possessing it).

Turning to the third alleged trade secret, know-how about ferroptosis and tiered assays, PTC has failed to carry its pleading burden. PTC alleges that the know-how comprises information on "how to (i) induce ferroptosis, (ii) measure protection against ferroptotic cell death, and (iii) use tiered screening assays to rapidly identify and optimize lead compounds for 15-LO inhibition." Dkt. No. 91-3 ¶ 18. But PTC alleges no facts beyond these "catchall" phrases. *InteliClear, LLC*, 978 F.3d at 658; *see also Vendavo, Inc.*, 2018 WL 1456697, at *4 (dismissing trade secret claims when the plaintiff has used only categories to describe the alleged trade secrets, including "negative know-how"). As the FAC makes clear, the process of ferroptosis and its role in development of neurodegenerative disease is no secret. Indeed, vast unredacted portions of the FAC are dedicated to explaining this scientific background. *See, e.g.*, *id.* ¶¶ 5-9, 36-41. So, the broad categories PTC identifies related to ferroptosis cannot be distinguished "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp.*, 152 F.3d at 1167.

Last, the parties briefly dispute whether PTC plausibly alleges the number of compounds it has tested containing the Proprietary Structural Motif constitutes a trade secret. Defendants contend the number itself has no "independent economic value from being kept secret." Dkt. No. 109-3 at 11. PTC's only response to the argument is to state: "Knowing how many compounds BioElectron tested, and which succeeded, is valuable to PTC because such information is non-obvious, not publicly known, and directly relates to compound selection and know-how." Dkt. No. 105-3 at 15. This does not suffice, as PTC fails to explain how the number of compounds tested translates to an economic benefit to any other actor in the market. Perhaps more importantly, the FAC similarly fails to allege any facts permitting a reasonable inference of such

benefit. In so far as PTC contends the number of compounds it has tested is a trade secret, it has failed to carry its pleading burden.

For these reasons, the Court determines PTC has plausibly alleged trade secrets regarding the Proprietary Structural Motif and assay cascade, as discussed above. Conversely, PTC has failed to plausibly allege trade secrets involving "know-how" or based on the number of compounds it has tested.

### B. Misappropriation

Under DTSA, "misappropriation" includes:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means to acquire the trade secret;
>
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that—
>
> (I) the trade secret was a trade secret; and
>
> (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5). PTC advances two theories of misappropriation. First, PTC asserts Defendants actually used and disclosed the alleged trade secrets under Section 1839(5)(B)(ii)(II). This theory of misappropriation does not require a showing of "improper means," only that

Defendants "knew or had reason to know" that the "knowledge" they used or disclosed was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret . . . ." *Id.* Second, PTC contends the FAC plausibly alleges "improper means," so the remaining misappropriation theories also apply. The Court first addresses use and disclosure absent "improper means" under Section 1839(5)(B)(ii)(II). Then, the Court turns to the sufficiency of the "improper means" allegations.

As discussed above, PTC has plausibly alleged two trade secrets regarding the Proprietary Structural Motif and the assay cascade. So, PTC must allege facts to permit a reasonable inference that Defendants used or disclosed those secrets, and knew the information had been "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II). As to the Proprietary Structural Motif, PTC has narrowly met its pleading burden; however, as to the assay cascade, it has not. Beginning with the Proprietary Structural Motif, PTC relies on four primary allegations to support an inference of misappropriation: 1) Drs. Shrader and Pintchovski both joined AcureX in late 2021, and prior to their employment had worked extensively on Vatiquinone and Utreloxastat for BioElectron, Dkt. No. 91-3 ¶¶ 105-05; 2) as part of their work on those drugs, Drs. Shrader and Pintchovski were deeply involved the development of the alleged trade secret, *id.* ¶¶ 83-89; 3) within a few years of working at AcureX, both Drs. Shrader and Pintchovski were named as inventors on the '151 Application, which disclosed a compound used to treat neurodegenerative disease, *id.* ¶¶ 114-16; and 4) the '151 Application contained the Proprietary Structure Motif, identical to [redacted], *id.* Whether these allegations suffice to permit a reasonable inference of misappropriation is a close question. However, because the Court must draw all reasonable inferences in PTC's favor, the Court concludes PTC has plausibly alleged misappropriation.

"[F]ew trade-secret plaintiffs will ever have anything but circumstantial evidence when pleading a complaint, before any discovery has occurred." *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2021 WL 8820180, at *15 (N.D. Cal. Aug. 24, 2021) (citations omitted). "In analyzing misappropriation, the inquiry focuses on all of the threads of its allegations woven together—the 'whole gestalt' of the complaint or evidence—not each in

isolation." *Id.* at *11. Accordingly, "[t]he competitor's knowledge will often have to be inferred from that evidence at the pleading stage." *Id.* at *15. Though PTC alleges mostly circumstantial evidence of misappropriation, those allegations mirror the evidence in *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 849 (N.D. Cal. 2019). There, the district court considered a trade secret misappropriation claim involving autonomous driving technology. *Id.* at 840-41. Finding a likelihood of success on the merits of the claim, the court relied on four pieces of evidence: 1) a former employee of the plaintiff occupied a leadership role at the competitor company; 2) the "implausibly fast" development of the autonomous driving technology at the competitor company; 3) the location of certain technical components in the competitor's car was the same as the plaintiff's; and 4) the timing of the defendant company's hiring of the plaintiff's former employee indicated the company knew he misappropriated the asserted trade secrets. *Id.* at 849-50. Here, PTC advances similar allegations, particularly Dr. Shrader's leadership position at AcureX, and the relatively fast timeframe for AcureX to develop a competing compound.[1] Moreover, PTC alleges the Proprietary Structural Motif appears in the '151 Application, and [redacted] Dkt. No. 91-3 ¶ 116. The alleged use of the Motif in a [redacted] is akin to the assertions in *WeRide Corp.*, where the competitor company had utilized a "radar component" in the same location as the plaintiff company's vehicles. 379 F. Supp. 3d at 849. Considering the allegations as a whole, and drawing inferences in the nonmovant's favor, PTC has plausibly alleged misappropriation of the Proprietary Structural Motif trade secret.

Turning to the assay cascade, PTC offers only conclusory allegations of use. In short, PTC

---

[1] PTC alleges the World Intellectual Property Association published the '151 Application on May 10, 2024. In opposing this motion, PTC notes the provisional priority date for the '151 Application was October 31, 2022, just over one year after Dr. Shrader arrived at AcureX. Dkt. No. 105-3 at 19. However, PTC does not request judicial notice of the application, nor does it argue the information is incorporated by reference into the FAC. Indeed, PTC does not direct the Court to any documentation of the provisional priority date. Therefore, the Court does not consider the October 2022 date in its analysis. It is, nonetheless, reasonable to infer from the allegations in the FAC that the '151 Application was submitted at some point prior to May 10, 2024. While the Court does not consider the development timeframe for the competing compound to be one year, the Court reasonably infers a timeframe of less than three years. This is significantly faster than BioElectron's alleged development timeframe, which began in 2006. Dkt. No. 91-3 ¶ 68.

assumes Defendants have used, and are currently using, the assay cascade based on: "(i) Defendants' intimate knowledge of this assay cascade; (ii) Defendants' lead compounds CU-12991 and CU-13001, inclusive of those disclosed in the relevant AcureX patent filings; and (iii) the compressed timeframe in which Defendants have advanced their lead compounds." Dkt. No. 91-3 ¶ 81. But PTC does not explain how the use of the cascade can be reasonably inferred from the substance of the patent applications. Use of the Proprietary Structural Motif could be inferred from its presence in the chemical structure of the AcureX compounds, as disclosed in those patent filings. *Id.* ¶ 116. Yet as to the assay cascade, PTC does not allege the information appears in any discernable way in those filings, nor does PTC explain how a compressed development timeframe indicates use of the proprietary assays as opposed to any other assays. Absent any factual allegations of use, the assay cascade claim cannot advance.

In the alternative, PTC contends the FAC plausibly alleges "improper means" sufficient to state a claim for misappropriation under an acquisition theory. *See* 18 U.S.C. § 1839(5)(A) (defining "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"). The Court is not persuaded. Under DTSA, the term "improper means":

> (A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and
>
> (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition . . . .

18 U.S.C. § 1839(6). PTC argues Defendants acquired the alleged trade secrets by "improper means" because Drs. Shrader and Pintchovski breached the confidentiality agreements they signed with BioElectron, and AcureX induced that breach. Dkt. No. 105-3 at 23-24. Yet PTC does not allege a factual basis for the breach or inducement—instead relying on an inference of breach from the alleged use of the Proprietary Structural Motif in the '151 Application. An assertion of "improper means" requires non-conclusory allegations of the breach. Indeed, cases finding a plausibly alleged "improper means" theory have substantiated the breach of duty with allegations of specific conduct. *See, e.g.*, *Volans-I, Inc. v. SpektreWorks, Inc.*, No. 19-CV-00634-PJH, 2019

WL 2300640, at *2 (N.D. Cal. May 30, 2019) (noting the defendant convinced a third-party to deliver the plaintiff's equipment to the defendant, and following cessation of the contract, the defendant did not return equipment to the plaintiff); *Gatan, Inc. v. Nion Co.*, No. 15-CV-01862-PJH, 2017 WL 1196819, at *3 (N.D. Cal. Mar. 31, 2017) (observing the defendant misrepresented to the plaintiff that it had no intention of competing in the spectrometer market prior to entering an agreement for exchange of proprietary information); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 883 (N.D. Cal. 2018) (noting the defendant did not return to the plaintiff confidential information it had received pursuant to an NDA). If an "improper means" claim only required the plaintiff to allege the existence of a duty to keep the information confidential, then it would be no different from a claim under Section 1839(5)(B)(ii)(II). What distinguishes an "improper means" claim from statutory provisions that do not use the term, is concrete allegations of breach or inducement. The FAC provides no such allegations.

**C. Statute of Limitations**

Under DTSA, a civil action "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Defendants assert PTC's claims are time-barred because the initial cease-and-desist communication was sent to Dr. Shrader in 2020. Dkt. No. 98-3 at 31. However, whether PTC exercised reasonable diligence at that time in attempting to uncover misappropriation of the Proprietary Structural Motif is beyond the bounds of the instant complaint. Further, PTC contends the assurances offered by Dr. Shrader and his counsel obfuscated the alleged misappropriation. Dkt. No. 105-3 at 29. The Court will not wade into this factual dispute on a Rule 12(b)(6) motion.

* * *

For these reasons, Defendants' motion to dismiss the DTSA claim is **GRANTED IN PART** and **DENIED IN PART**. PTC's claims based on the assay cascade, "know-how," and the number of compounds PTC has tested are dismissed. PTC's claim based on the Proprietary Structural Motif may advance.

## II. CONTRACT CLAIMS

On amendment, PTC asserts the same basis for its contract claims. In sum, Drs. Shrader and Pintchovski allegedly violated the terms of the Proprietary Information Agreements they signed with BioElectron/Edison Pharmaceuticals, which were acquired by PTC. PTC also contends Defendants violated the implied covenant of good faith and fair dealing by misrepresenting Dr. Shrader's and Dr. Pintchovski's role in the '682 Application to hide their alleged breach of the contracts.

As noted in the Court's prior order, California law governs the Proprietary Information Agreements. *PTC Therapeutics, Inc.*, 2026 WL 350772, at *8. So, "[t]o state a claim for breach of contract, the plaintiff must plausibly allege '(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.'" *Access Optical Networks, Inc. v. Seagate Tech. LLC*, No. 24-CV-03745-EKL, 2025 WL 240799, at *5 (N.D. Cal. Jan. 17, 2025) (citing *Oasis W. Realty LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011)). Separately, "to establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: '(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.'" *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *48 (N.D. Cal. Aug. 30, 2017) (citation omitted).

PTC has plausibly alleged a breach of the Proprietary Information Agreements based on use of the Proprietary Structural Motif in the development of AcureX's compounds. In response, Defendants argue PTC can only bring a breach of contract claim based on agreements related to the EPI-743, EPI-589, and EPI-857 compounds. Dkt. No. 98-3 at 29. Even if true, the FAC alleges the Proprietary Information Agreements relate to those compounds. The agreements were operative at the time Drs. Shrader and Pintchovski were working on EPI-743, and the agreements prohibit disclosure of "trade secrets." Dkt. No. 91-3 ¶¶ 63-68, 73-75. Accordingly, the alleged misappropriation of the Proprietary Structural Motif permits a reasonable inference of breach of

United States District Court
Northern District of California

the Proprietary Information Agreements.

Regarding the breach of the covenant of good faith and fair dealing, PTC has failed to plausibly allege a factual basis for its claim. To the extent PTC continues to rely on allegations that Drs. Shrader and Pintchovski fraudulently concealed their identities as the true inventors of the '682 Application, it has offered no new allegations, and similarly fails to meet its burden under Federal Rule of Civil Procedure 9(b). *PTC Therapeutics, Inc.*, 2026 WL 350772, at *9. Additionally, PTC now asserts the representations made by Dr. Shrader and his counsel in response to the cease-and-desist letters constitute a basis for the claim. Dkt. No. 105-3 at 26. This argument lacks merit. To start, the FAC does not allege Dr. Pintchovski's involvement in any of that correspondence, so PTC has not asserted a claim against him. And even if it did, PTC does not present any factual allegations explaining how the letter from Dr. Shrader's counsel "unfairly interfered" with its rights under the contracts or whether the communications at that time were made in bad faith.

Therefore, Defendants' motion to dismiss is **DENIED** as to the breach of contract claim and **GRANTED** as to the breach of the implied covenant of good faith and fair dealing claim.

## III. UCL CLAIM

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. However, under California law, the California Uniform Trade Secrets Act ("CUTSA") "provides the exclusive civil remedy for conduct falling within its terms and supersedes other civil remedies based upon misappropriation of a trade secret." x.*AI Corp. v. OpenAI, Inc.*, 821 F. Supp. 3d 1100, 1112 (N.D. Cal. 2026) (citation omitted). Though CUTSA "expressly allows contractual and criminal remedies, whether or not based on trade secret misappropriation," it preempts civil remedies. *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954 (2009). This includes claims under the UCL. *See id.* at 962 (holding CUTSA preempted a UCL claim based on "the same conduct that g[ave] rise to [the] trade secrets claim"). Because the factual basis underlying PTC's cause of action under the UCL is identical to the alleged misappropriation that animates the DTSA claim, CUTSA preempts PTC's claim. Accordingly, Defendants' motion to dismiss the UCL claim is **GRANTED**.

**IV. DECLARATORY JUDGMENT**

PTC seeks a declaration that it "is the true and lawful owner of all right, title, and interest in" Int'l Pat. Appl. No. PCT/US2023/073312, WO 2024/050513 A1, filed March 7, 2024. Dkt. No. 91-3 ¶ 193. In the alternative, PTC seeks an order "reassigning all rights in the disputed patent application and all patents issuing therefrom to PTC" or a declaration that PTC is a "co-owner" of the patent. *Id.* Plaintiff's request for relief is governed by the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides: "[i]n a case of actual controversy," a court "may declare the rights and other legal relations of any interested party . . . whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Analysis under the Act proceeds in two parts: first, a court must determine whether an "actual controversy exists," and second, whether to exercise its discretion to permit the declaratory judgment action. *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143-44 (9th Cir. 1994).

"The Declaratory Judgment Act does not provide a cause of action when a party . . . lacks a cause of action under a separate statute and seeks to use the Act to obtain affirmative relief." *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022). "The availability of relief under the Declaratory Judgment Act 'presupposes the existence of a judicially remediable right.'" *Id.* (citation omitted). Since PTC has plausibly alleged other claims, declaratory relief is available at the Court's discretion. Defendants argue the Court should dismiss PTC's claim for a declaration of patent ownership on these allegations because it would run afoul of California Business and Professions Code § 16600. Dkt. No. 98-3 at 31. Under that provision, "[a]ssignment clauses are 'unlawful non-compete provisions where they require an employee to assign an invention conceived after departing from an employer's service.'" *Fibrogen, Inc. v. Hangzhou Andao Pharm. Ltd.*, No. 22-CV-07148-AMO, 2024 WL 1199018, at *6 (N.D. Cal. Mar. 20, 2024). Based on the present allegations, the Court determines Section 16600 is inapplicable, since it applies to *contracts*, not judicial remedies to trade secret misappropriation. PTC's requested relief is a declaration from the Court about ownership of a patent; it does not implicate a contract seeking to bind an employee after he has departed employment. Therefore, Defendants' motion to dismiss PTC's request for declaratory relief is **DENIED**.

## CONCLUSION

Based on the foregoing reasons, Defendants' motion to dismiss PTC's DTSA claim is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to PTC's claims based on the assay cascade, "know-how," and the number of compounds PTC has tested. The motion is **DENIED** as to PTC's claim based on the Proprietary Structural Motif. Further, the motion to dismiss is **DENIED** as to the breach of contract claim and **GRANTED** as to the breach of the implied covenant of good faith and fair dealing claim. PTC's UCL claim is preempted by CUTSA, and thus Defendants' motion to dismiss is **GRANTED**. Last, the motion to dismiss is **DENIED** as to PTC's request for declaratory relief.

The Court has previously granted leave to amend the Complaint, noting in its prior order that PTC had failed to plausibly allege a breach of the implied covenant of good faith and fair dealing. PTC has offered no new plausible allegations as to this claim, and so it is dismissed **without leave to amend**. Moreover, since PTC's UCL claim is preempted by CUTSA, further amendment would be futile. Accordingly, the dismissal of the UCL claim is **without leave to amend**.

However, the Court grants leave to amend the DTSA claims based on "know-how" and the number of compounds tested. Likewise, PTC may amend its allegations of misappropriation of the assay cascade. Should PTC choose to amend, it may only add allegations as to these claims. Otherwise, PTC shall not add new causes of action or name additional defendants absent stipulation or leave of Court. Any amended complaint must be submitted within 21 days of the posting of this Order.

**IT IS SO ORDERED.**

Dated: September 11, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**